IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

TONY KASSA,                      *

        Plaintiff,               *

vs.                              *          CASE NO. 4:18-cv-2 (CDL)

SYNOVUS BANK,                    *

        Defendant.               *

_____

## O R D E R

Tony Kassa was terminated from his job at Synovus Bank after he told a female bank teller that he hates working with women. Kassa claims that he had a disability that Synovus refused to accommodate and that he made the statement when his disability flared up. Kassa brought discrimination claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*[1] Synovus seeks summary judgment on all of Kassa's claims. As discussed below, the Court grants Synovus's summary judgment motion (ECF No. 14).

### SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

---

[1] Kassa initially sued Synovus Financial Corporation, but Synovus Bank was his employer. Kassa filed a motion to amend his complaint to name the correct Defendant, and there was no objection. Accordingly, Kassa's motion for leave to amend (ECF No. 32) is granted and Synovus Bank is substituted as the Defendant.

Civ. P. 56(a).  In determining whether a *genuine* dispute of *material* fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, drawing all justifiable inferences in the opposing party's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  A fact is *material* if it is relevant or necessary to the outcome of the suit.  *Id.* at 248.  A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party.  *Id.*

FACTUAL BACKGROUND

Viewed in the light most favorable to Kassa, the present record reveals the following facts.

Kassa began working for Synovus in 2015.  Before he joined Synovus, Kassa served in the U.S. Army for more than a decade; worked in various information technology roles for employers in Columbus, Georgia; received a Bachelor of Arts in communication information systems maintenance; worked in the economic development department at Columbus Technical College; and was a Cisco/Network Instructor at Virginia College.

Over the years, Kassa has received treatment for depression, anxiety, intermittent explosive disorder, bipolar disorder, alcohol addiction, paranoid personality disorder, and impulse control disorder.  In 2013, Kassa's psychiatrist, Kashmira Parekh, wrote a "To Whom it May Concern" letter

explaining that Kassa was under Parekh's care for "Intermittent Explosive Disorder, Paranoid Personality Disorder, and Alcohol Abuse." Def.'s Mot. for Summ. J. Ex. F, Parekh Letter (Oct. 23, 2013), ECF No. 14-8. The same year, Kassa's primary care physician, Jatin Pithadia, wrote a "To Whom it May Concern" letter explaining that Kassa was under Pithadia's care for "Alcohol related illnesses, Depression, Anger issues, and Bipolar issues." Def.'s Mot. for Summ. J. Ex. G, Pithadia Letter (Nov. 11, 2013), ECF No. 14-9.

Synovus hired Kassa as a Network Support Analyst, Lead in November 2015. His job was to manage the Network Operations Center, and his team monitored Synovus's websites, automated teller machines ("ATMs"), server performance, and transaction servers to make sure they worked properly. If there was a problem, the Network Operations team determined its root cause and contacted the appropriate people to fix the problem.

When Kassa began working at Synovus, he worked the night shift Friday through Monday, and his supervisor was Diana Young. During his training, Kassa told Young "that he had issues . . . sometimes he would get angry or upset;" Young believed Kassa had post traumatic stress disorder. Young Dep. 39:7-10, 43:5-6, ECF No. 36-10. Kassa asked Young if it would be a problem "if he needed to get up and . . . take a break" when that happened. *Id.* at 39:12-13. Young told Kassa that there was no problem

with him getting up to walk around as long as his area was covered, people knew where he was, and he could be reached if needed. *Id.* at 39:12-20, 42:16-24. According to Young, this arrangement worked. Kassa also told his coworkers that "they had nothing to worry about because [he] wasn't violent and [he] just speak[s] the truth." Kassa Dep. 109:9-12, ECF No. 22. And, Kassa stated that his disorders were under control when he took his medicine and took a short break. *Id.* at 108:17-19, 109:7-9.

In 2016, Synovus decided to outsource the Network Operations Center functions to an Indian company called Happiest Minds. The transition began in July 2016. Many of Kassa's coworkers were laid off as part of the transition, but Kassa's supervisors wanted to keep him because he was a hard worker, very knowledgeable, and very smart. Kassa's supervisors wanted a network engineer expert like Kassa to support the ATM team, which handled customer service calls for issues with Synovus ATMs. So, Kassa was moved to the ATM team day shift, although he remained in the Network Operations Center until the transition to Happiest Minds was complete in February 2017 and officially transitioned to the ATM team February 27, 2017. The new position involved answering customer service calls, and Kassa told Young that he was concerned about having to answer the phones on the day shift. Young believed that the position

was not a good fit for Kassa, but it "was like the last resort of choices [Young and senior director Antonio Sampson] had for . . . Kassa." Young Dep. 48:6-21. Kassa also expressed his concerns to his senior director, Antonio Sampson, and to human resources manager Charles Burks. He told them that the ATM team was "not a good place for [him] to go" because he was "going to end up losing [his] temper talking to somebody on the phone." Kassa Dep. 168:17-19. It was Sampson's intention for Kassa to be a technical resource who would assist ATM technicians in resolving technical issues, not directly answering telephone calls. Sampson Dep. 33:14-34:17, ECF No. 18. But Sampson was reassigned during the transition, and he was no longer responsible for Kassa's department.

In August 2016, Kassa updated his team member profile to state that he is disabled; the profile does not contain any specific information regarding his disability. Wes Mason became Kassa's supervisor in October 2016.[2] Kassa told Mason, "I have a condition that sometimes I can't control what I say. Moving me to the phones is not going to be a good idea and I'm probably going to get fired[.]"[3] Kassa Dep. 111:22-112:1. At the time, Kassa did not provide Mason with any documentation regarding his

---

[2] Kassa also applied for the supervisor job, but Mason got it. Kassa does not assert a failure to promote claim based on this decision.
[3] Mason denies that Kassa told him he had a disability. But Kassa testified that he did tell Mason about his disorders, and the Court must view the record in the light most favorable to Kassa.

condition, and Mason did not ask for any. Kassa later asked Mason if he was supposed to answer the phones. Mason said, "yeah, that's kind of your job." *Id.* at 117:2-5. Kassa asked if he could "just talk to the technicians." *Id.* at 117:7-9. Mason replied that he did not have enough people for that. Kassa also applied for positions outside the ATM team, but he was not selected. He asked for permission to work nights or from home, but those requests were denied; the ATM support position could not be performed from home "because the Synovus telephone system does not enable calls to be routed to off-site employees," and the network support duties Kassa had previously performed at night had been outsourced to Happiest Minds. Mason Aff. ¶ 13, ECF No 14-12. Finally, Kassa told Mason that he may need "to get up and take a break." Kassa Dep. 117:17-19. Kassa did not point to evidence that Mason told him he could *not* take a break as Young had permitted him to do.

In November 2016, Kassa was written up for failure to report a server outage properly, which resulted in a lengthy outage that had "a major impact on business operations." Def.'s Mot. for Summ. J. Ex. N, Team Member Counseling Form 2 (Nov. 8, 2016), ECF No. 14-16. The counseling form states that Synovus typically uses a progressive disciplinary process, beginning with documented verbal counseling. *Id.* at 1. But the form also states that Synovus "reserves the right to escalate disciplinary

procedures . . . at any time based upon the specific situation and business conditions." *Id.* And, it says that a first written warning like the one Kassa received may be used "when the severity of an issue warrants." *Id.* Kassa does not dispute that the incident happened, but he believes that he should have received verbal counseling instead of a written warning. He did not point to any evidence to suggest that Synovus skipped the verbal warning because of Kassa's disorders.

Kassa's first performance review with Mason was in January 2017. Mason rated Kassa as "Exceeds Expectations" in technical resource but "Below Expectations" in team performance. Def.'s Mot. for Summ. J. Ex. O, Performance Review Report 2-3, ECF No. 14-17. Mason noted that if the review were based solely on "the technical side of things," Kassa would "be reflected as a rockstar." *Id.* at 3. He further noted that valuable skills for support team roles like Kassa's include being "open to working with other teams" and "engaging others." *Id.* Mason also stated that although Kassa's night shift peers were "deeply loyal to him," there was "a definite disconnect" between Kassa and the rest of the team, "and there have been some issues because of this." *Id.* at 2. Mason stated that he would like to see Kassa "be less confrontational . . . , more open to suggestions, and more able to work with his peers, without requiring management intervention or assistance." *Id.* Mason concluded by stating

that Kassa had "a ton of potential" and would do "great things" with Synovus if he could "get past some of the attitude/perception issues and start fresh with his peers." *Id.* at 4. Kassa agreed that his potential was "great" and that he just needed "to work on [his] communication issues." *Id.* The performance review report does not mention any disability or request for accommodations, but Kassa asserts that he and Mason discussed his anger disorder during the performance review meeting and that he asked to be taken off the phones. Kassa Dep. 332:3-333:7.

In late January 2017, Kassa sent emails to Mason and others regarding the Happiest Minds transition. In one email, which he sent to the entire team, including the Happiest Minds personnel (he asserts that he accidentally included them), Kassa asked when Synovus team members would "stop showing and telling [the Happiest Minds resources] the same things over and over again[.]" Def.'s Mot. for Summ. J. Ex. Q, Email from T. Kassa to W. Mason, *et al.*, (Jan. 28, 2017), ECF No. 14-19. In a separate email, Kassa attached several instant message chat logs between himself and Happiest Minds personnel, including the following:

    Ashe,Perron 10:33 PM
    what is the problem with the atm list

    Gunti,Rajesh 10:34 PM
    give you in 2 min perron

Kassa,Tony 10:37 PM
Why Has No One done anything with the SQL Alert that
is over 30 mins old?

Narsale,Chandrakant 10:37 PM
we are checking.

Kassa,Tony 10:38 PM
nothing to check handle the Alert. How often do you
check our screens?

Narsale,Chandrakant 10:40 PM
Sorry Tony, we areworking on it.

Kassa,Tony 10:41 PM
You did not answer my question.. How Often do You
Check Our Screens compared to others, Please Answer...

Kassa,Tony 10:53 PM
I want Answeres

Gunti,Rajesh l0:56 PM
Sorry, Tony for the late reply
we are monitoring the allerts continuesly

Kassa,Tony 10:56 PM
No you are not, it was up there for 35 mins
How many oher things are you doing
Lets try this again
You did not answer my question.. How Often do You
Check Our Screens compared to others, Please Answer...

Gunti,Rajesh 10:57 PM
we are doing all the tasks
Like Monitoring , ATM's and Calls

Kassa,Tony 10:58 PM
Clients

Gunti,Rajesh 10:58 PM
yes

Kassa,Tony 10:59 PM
So You more clients than just us to watch? is that
what your saying?

> Gunti,Rajesh 11:00 PM
> sorry , i did not get you

Def.'s Mot. for Summ. J. Ex. R, Email from T. Kassa to W. Mason
& J. Rang (Jan. 28, 2017), ECF No. 14-20.   Another Synovus team
member, Josh Marshall, also joined the chat:[4]

> Marshall,Josh 11:00 PM
> Other than Synovus NOC, what other job are you doing?
> Chandrakant and Danda, you guys better answer as well.
>
> Narsale,Chandrakant 11:01 PM
> Sure josh.
>
> Shagavan,Danda 11:0l PM
> sure josh
> we are doing syovus NOC jobs only.
>
> Marshall,Josh 11:02 PM
> Then why is it taking you so long to look at our
> alerts, atms, emails everything that jumps on the
> screen.
>
> Narsale,Chandrakant 11:06 PM
> Josh, we are apologies for that, we will keep eye on
> alert's.
>
> Marshall,Josh 11:09 PM
> Alright, there might be a language barrier between us,
> but everyone knows when someone doesnt answer a
> question and or avoiding it that it starts to look s
> suspicious and raises eye brows. Make sure you get the
> job done with in the time that is specified or im sure
> someone in our higher echelon will make sure it gets
> done.
>
> Gunti,Rajesh 11:11 PM
> Sure Josh and Tonny sorry for the mistake which happen
> and we wont repet it again

*Id.*

---

[4] According to Mason, Kassa was the team lead, and Mason believed that
Kassa set the tone for Marshall, effectively giving him "the green
light to act in the same way."  Mason Dep. 71:2-7, ECF No. 20.

Mason issued Kassa a second written warning after receiving the emails. Mason stated in the warning that Kassa made "a number of very rude and unprofessional statements" to the Happiest Minds personnel. Def.'s Mot. for Summ. J. Ex. P, Team Member Counseling Form 1 (Feb. 1, 2017), ECF No. 14-18. He further stated: "This is obviously not the way we want to interact with those new team members and runs the risk of breaking their confidence before they have an opportunity to build it, as well as painting Synovus in a negative light." *Id.* Mason noted that he expected Kassa to interact "with all team members, whether they are actual Synovus employees, contractors, vendors, or anyone else, in a professional, kind, and courteous manner at all times." *Id.* at 2. He further stated that if Kassa "does not show the ability to work with others in an acceptable manner, this will lead to further actions, potentially including termination." *Id.*

Kassa appears to contend that there was nothing inappropriate about his communication with the Happiest Minds personnel. Kassa asserts that Mason instructed him to put pressure on the Happiest Minds personnel, but his citations to the record do not support this assertion. Rather, the citations establish that Kassa asked for confirmation that the "off shore team" would handle all calls and alerts during the "Single Bank" rebranding project. Mason responded that the offshore team was

not handling all calls yet, that he preferred to have Tony "lead all efforts" during the project, and that Mason "want[ed] things run VERY tightly." Mason Dep. Ex. 5, Emails between W. Mason & T. Kassa (Jan. 19, 2017), ECF No. 20-1 at 11. Mason later explained that he wanted Kassa "to help make sure that th[e] new people understood what the expectations were." Mason Dep. 60:20-61:1, ECF No. 20. Kassa says that he interpreted this message as an instruction to "push" the Happiest Minds team, and he acknowledged that he pushes people by "creat[ing] stress" to see if they "are going to fold" and that he does this "to help them." Kassa Dep. 208:16-23.

In any event, Mason and his supervisor Jason Rang had a meeting with Kassa regarding the write-up, and Kassa asserts that he told Mason and Rang "what [he] suffered from," that he was "trying to seek help for it," and that he "didn't get to [his medicine] in time." *Id.* at 204:11-15. Kassa also told Mason and Rang that he did not "need to be on the phones." *Id.* at 112:3-14. Kassa prepared a written rebuttal to the write-up, explaining why he said what he did during the chats, noting that he did not understand what the standards were for interacting with his colleagues given that he had not previously been punished for his communication style ("I am honest and do not sugarcoat things"). Def.'s Mot. for Summ. J. Ex. S, Rebuttal to Written Reprimand 2, ECF No. 14-21. The rebuttal does not

mention Kassa's disorders, but it does state that Kassa felt that he was "singled out and discriminated against in this process" and that everyone else should be held to the same standards as he was. *Id.*

After he received the second write-up, Kassa scheduled a meeting with Charles Burks in the human resources department. He met with Burks on March 10, 2017 and gave Burks a copy of the 2013 letters from Drs. Parekh and Pithadia. Kassa also told Burks that he was worried that something similar would happen in the future if he was not taken off the phones or allowed to speak only to technicians.

Kassa officially transferred to the ATM team on February 27, 2017. His job duties included monitoring the network operations center and fixing problems that Happiest Minds could not fix, taking calls regarding ATM outages, and helping with network engineering. Kassa soon realized that the job regularly required him to work with the three other ATM team members to answer telephone calls from Synovus employees reporting ATM outages. Kassa Dep. 314:6-12, 315:6-13. The three other members of the ATM team were women. *See id.* 312:17-313:13. The ATM team had a queue for answering the phones; if one team member was away from her desk, then the call rolled to the next team member in the queue. So, if the three other team members were away from their desks, Kassa had to take the call. *Id.*

13

On July 20, 2017, Kassa answered a call from a female Synovus teller regarding a customer's problem with the ATM at her branch. They joked briefly at the beginning of the call, then began discussing the issue. Kassa prepared to give the teller the incident number, he asked if she knew the phonetic or military alphabet; when she did not respond, Kassa said, "I was impressed, but . . ." and then gave her the incident number using the regular alphabet and numbers. Def.'s Mot. for Summ. J. Ex. V, Audio Recording 1:19-1:37 (July 20, 2017). The teller said she already had the incident number and said that her question for Kassa was about other information she needed to fill out a dispute form for the customer. Kassa yelled over to his female coworker, Chris, for help answering the question. Chris responded that the ATM team did not have access to the information and that the teller would have to get the information from the customer's receipt; she also provided additional information that is inaudible because the teller and Kassa were also speaking. *Id.* at 2:51-3:29. Kassa now claims that Chris was attacking him, but that is not evident from the audible portions of Chris's response on the recording. Apparently dissatisfied with Chris's response, Kassa told the teller, "Nothing personal, I hate working with women." *Id.* at 3:28-3:32. She responded "oh, that's, that's . . ." and then stopped talking. Kassa said, "Nothing personal, you might be

14

totally different, I don't know." *Id.* at 3:33–3:37.  Throughout
the call, Kassa's voice is calm and even jovial.

The teller's manager contacted Mason to complain about the
call between Kassa and the teller.  Mason Dep. 90:19–91:25.
Mason investigated by listening to a recording of the
conversation.  He did not speak with the teller or with Kassa;
he said he "could hear everything [he] needed to [hear] on the
call." *Id.* at 92:4–7.  Mason consulted with Dan Steele from the
human resources department, and they decided to terminate Kassa.
Mason Dep. 99:22–100:16.  Mason prepared a team member
counseling form summarizing the phone call and stating that
"[t]his sort of behavior has been a pattern with [Kassa] over
the past 6 months, one that got him written up back in February,
and one that we have continually talked about in terms of what
not to do when interacting with customers or anyone else."
Def.'s Mot. for Summ. J. Ex. T, Team Member Counseling Form 2
(July 20, 2017), ECF No. 14–22.  Mason stated that Kassa was
expected to interact with all team members "in a professional,
kind, and courteous manner at all times. . . . Because these
expectations were not met consistently over the past year,
multiple written warnings have been given, in addition to ad hoc
coaching, leading to this final action of termination." *Id.*

Kassa testified that "the only job" that was impossible for
him to perform because of his disorders was a customer service

job; there are "tons of jobs" he could do. Kassa Dep. 430:17-431:12. Kassa believes that if he had been permitted to talk only with technicians and was not required to take telephone calls from non-technicians, he would not have made the comments that led to his termination. *Id.* at 257:6-14.

Kassa submitted an informal intake questionnaire to the Equal Employment Opportunity Commission ("EEOC") on September 12, 2017. He later filed a verified charge of discrimination on October 17, 2017, alleging disability discrimination.

DISCUSSION

Kassa claims that he is disabled and that Synovus discriminated against him because of his disability by refusing to provide reasonable accommodations and by terminating him for the July 2017 phone call incident. Kassa also asserts that Synovus retaliated against him for complaining about disability discrimination. The Court addresses each claim in turn.

## I. Kassa's Discrimination Claims

"To establish a prima facie case of discrimination under the ADA, a plaintiff must show: (1) he is disabled; (2) he is a qualified individual; and (3) he was subjected to unlawful discrimination because of his disability." *Holly v. Clairson Indus., LLC*, 492 F.3d 1247, 1255-56 (11th Cir. 2007). A disability means "a physical or mental impairment that substantially limits one or more major life activities of" an

16

individual. 42 U.S.C. § 12102(1)(A). Although Synovus argues that Kassa is not disabled within the meaning of the ADA, the Court assumes that he is because of his bipolar disorder and intermittent explosive anger disorder, which are controlled with medication. *See* 29 C.F.R. § 1630.2(j)(1)(i) ("The term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA. 'Substantially limits' is not meant to be a demanding standard."); 29 C.F.R. § 1630.2(j)(3)(iii) (noting that "it should easily be concluded that the following types of impairments will, at a minimum, substantially limit the major life activities indicated: . . . bipolar disorder [and other mental disorders] substantially limit brain function").

The Court also assumes that Kassa was a qualified individual within the meaning of the ADA. A qualified individual "satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires and, with or without reasonable accommodation, can perform the essential functions of such position." 29 C.F.R. § 1630.2(m). Synovus argues that Kassa was not qualified for his position because he admitted to Dr. Parekh that he used cocaine sometime in December 2015. Synovus further contends that if Kassa had reported to work with cocaine in his system, he would not have been qualified to do his job,

and he would have been fired for violating Synovus's drug use policies. But Synovus did not point to any evidence that Kassa reported to work with cocaine in his system or tested positive for cocaine use, so the Court cannot find as a matter of law that Kassa was unqualified based on his admission to Dr. Parekh. Synovus also argues that Kassa was unqualified because he was unable to work with others. But the record viewed in the light most favorable to Kassa suggests that Kassa *was* able to work with others most of the time, so there is at least a genuine fact dispute on whether Kassa was a qualified individual.

The next question is whether Kassa was discriminated against *because of* his disorders. Kassa argues that Synovus discriminated against him in two ways: (1) it failed to provide a reasonable accommodation for his disorders and (2) it terminated him because of his disorders.

A. Failure to Accommodate

Discrimination under the ADA includes "not making reasonable accommodations to the known . . . mental limitations of an otherwise qualified individual" unless the individual's employer "can demonstrate that the accommodation would impose an undue hardship on the operation of the business." 42 U.S.C. § 12112(b)(5)(A). A plaintiff is "not entitled to the accommodation of [his] choice, but only to a reasonable accommodation." *Stewart v. Happy Herman's Cheshire Bridge,*

*Inc.*, 117 F.3d 1278, 1286 (11th Cir. 1997) (quoting *Lewis v. Zilog, Inc.*, 908 F. Supp. 931, 948 (N.D. Ga. 1995)). The Eleventh Circuit has made it clear that the ADA does not require an employer "to transform the position into another one by eliminating functions that are essential to the nature of the job as it exists." *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1260 (11th Cir. 2001); *accord Holly*, 492 F.3d at 1262 n.16 (noting that an employer is not required to eliminate an essential function of the plaintiff's job). "The difference between the accommodation that is required and the transformation that is not is the difference between saddling a camel and removing its hump." *Lucas*, 257 F.3d at 1260.

Here, Kassa argues that he repeatedly asked Synovus to accommodate his disorders by changing his ATM team job to eliminate the requirement that he answer customer service telephone calls from non-technicians.[5] Kassa did not point to sufficient evidence to dispute that when he was reassigned to

---

[5] Kassa also applied for several positions outside the ATM team, but he did not argue or point to evidence that Synovus's decision not to select him for these positions amounts to a failure to accommodate. Kassa further asserts that he told his supervisors that he may occasionally need to take short breaks. Kassa did not point to any evidence that Mason or anyone else told him he was not allowed to take breaks when he was frustrated. There is evidence that Kassa had to take calls when no one else on his team was available, Kassa Dep. 312:17–313:13, which was the same rule he had under Young's supervision. Finally, Kassa asked for permission to work nights or from home, but he did not present evidence to dispute that these requests could not be granted because there was no night position available after the reorganization and because the customer service telephone calls could not be routed to an employee's home.

the ATM team, an essential function of his job was answering
customer service telephone calls from Synovus employees
reporting ATM outages. In fact, Kassa testified that the
function of answering telephone calls regarding ATM outages was
"just about all [his job] was." Kassa Dep. 315:6-13. Thus, the
Court finds the present record, even when viewed in the light
most favorable to Kassa, establishes as a matter of law that
answering customer service calls regarding ATM outages was an
essential function of Kassa's job once he was reassigned to the
ATM team. Synovus was not required to eliminate that essential
function of Kassa's job, and his failure to accommodate claim
thus fails.

Kassa points out that the ADA regulations state "it may be
necessary for [an employer] to initiate an informal, interactive
process with" a disabled employee to determine potential
reasonable accommodations. 29 C.F.R. § 1630.2(o)(3). But the
Eleventh Circuit has concluded that the ADA does not provide a
cause of action for failure to investigate possible
accommodations, particularly where the plaintiff cannot
demonstrate that he was denied a reasonable accommodation that
would have enabled him to perform the essential functions of his
job. *Willis v. Conopco, Inc.*, 108 F.3d 282, 285 (11th Cir.
1997). So, to the extent Kassa seeks to assert an ADA claim

based on Synovus's alleged failure to engage in an interactive process to find a reasonable accommodation, that claim fails.

B.   Kassa's Termination

Kassa also argues that he was terminated *because of* his disorders since he was terminated for an "outburst" related to his disorders.   There is no real dispute that Kassa was terminated because of his statements on the July 20, 2017 telephone call, including his statement to a female bank teller that he hates working with women.   Though Kassa tries to dismiss his statements as jovial joking banter, he cannot seriously dispute that his supervisor reasonably believed that he was rude and unprofessional to the female teller.   And, there is also no dispute that this incident happened after Kassa had been counseled about his communication style and after he was written up for two previous incidents, one of which involved being unprofessional and rude to other team members.[6]   Even if Kassa's conduct was related to his disorders, the Court is not convinced that the ADA requires an employer to maintain indefinitely an employee who is rude and unprofessional to his coworkers and who tells a female coworker that he hates working with women.

---

[6] Kassa does not argue or point to any evidence to suggest that Synovus's use of a written write-up instead of a verbal warning for the server outage issue in November 2016 was because of his disorders. Therefore, to the extent Kassa attempted to assert a disability discrimination claim based on Synovus's failure to use progressive discipline, that claim is abandoned.

The Eleventh Circuit has not issued a published opinion holding that an employee's misconduct related to a disability is not a disability. *See Caporicci v. Chipotle Mexican Grill, Inc.*, 729 F. App'x 812, 816 & n.4 (11th Cir. 2018) (per curiam) (noting that "[w]hether a firing based on disability-related [misconduct] constitutes disability-based discrimination under the ADA is an open question in this circuit" but declining to reach the issue because the plaintiff had abandoned it on appeal). But the Eleventh Circuit has suggested in unpublished opinions that misconduct related to a disability is not itself a disability, and the Court is persuaded that this is the correct rule. For example, in *J.A.M. v. Nova Se. Univ., Inc.*, 646 F. App'x 921 (11th Cir. 2016) (per curiam), a case under Title III of the ADA, the Eleventh Circuit concluded that a medical student who was dismissed from medical school was not dismissed because of his mental disability but because of "alcohol-related behavioral misconduct." *Id.* at 926. The Eleventh Circuit stated that the medical school was "not required to excuse past misconduct, even if that misconduct is linked to a student's mental disability" and that the student's "mental disability [did] not excuse his misconduct." *Id.; accord Ray v. Kroger Co.*, 264 F. Supp. 2d 1221, 1228–29 (S.D. Ga. 2003), *aff'd,* 90 F. App'x 384 (11th Cir. 2003) (concluding that there was no ADA violation when a grocery store terminated a grocery clerk for

outbursts of vulgar language that were caused by his Tourette's Syndrome); *see also Hamilton v. Sw. Bell Tel. Co.,* 136 F.3d 1047, 1052 (5th Cir. 1998) (finding "the ADA does not insulate emotional or violent outbursts blamed on an impairment" and that that an employee who was fired after he verbally abused and struck a coworker was not fired because of his PTSD but because of "his failure to recognize the acceptable limits of behavior in a workplace environment"). In summary, even if Kassa's July 20, 2017 statements and his prior "outbursts" were related to his disorders, his termination for those statements and similar prior misconduct is not disability discrimination.

## II. Kassa's Retaliation Claim

Kassa asserts that Synovus retaliated against him for complaining of disability discrimination.[7] The ADA prohibits such retaliation. 42 U.S.C. § 12203(a). To establish retaliation, Kassa "must show that: (1) [he] engaged in a statutorily protected expression, (2) [he] suffered an adverse employment action, and (3) there was a causal link between the two." *Frazier-White v. Gee*, 818 F.3d 1249, 1258 (11th Cir. 2016). "The third element requires a showing of but-for causation." *Id.*

---

[7] The Court assumes for summary judgment purposes that Kassa met the ADA's exhaustion requirement for his retaliation claims because those claims are related to the disability discrimination allegations contained in his EEOC charge.

Kassa appears to argue that he engaged in protected activity when he submitted his rebuttal statement shortly after his February 1, 2017 written warning and when he asked in February and March 2017 to be taken off the phones. The Court assumes for summary judgment purposes that these actions constitute protected activity.[8] Kassa asserts that Synovus retaliated against him for this protected activity when it denied his requests to be taken off the phones in February and March 2017 and when it terminated him in July 2017.

As discussed above, answering customer service telephone calls was an essential function of Kassa's job on the ATM team, so the Court finds that Synovus's refusal to grant Kassa's request to eliminate this part of his job was not an adverse employment action. Kassa thus cannot base an ADA retaliation claim on this decision.

Regarding his termination, Kassa did not point to any evidence that his protected activity was the but-for cause of his termination. Rather, he acknowledges that his "outburst" in July 2017 was the reason for his termination. And, even if Kassa had pointed to some evidence to suggest that his

---

[8] Requesting reasonable accommodations is certainly protected activity. *Frazier-White*, 818 F.3d at 1258. So is complaining about disability discrimination, if the employee had a good faith, reasonable belief that the employer was engaged in disability discrimination. Although Kassa stated in his rebuttal that he felt he was singled out and discriminated against, the rebuttal does not explicitly mention Kassa's disorders, so it is not clear that the rebuttal was protected activity. The Court nonetheless assumes that it was.

termination was causally related to his protected activity four months prior, he did not point to any evidence to rebut Synovus's legitimate nonretaliatory reason for his termination: Kassa's supervisor reasonably believed that he was rude and unprofessional to the female teller after he had been counseled about his communication style and after he was written up for two previous incidents. Therefore, Kassa's retaliation claim based on his termination fails.

## CONCLUSION

For the reasons set forth above, the Court grants Synovus's summary judgment motion (ECF No. 14).

IT IS SO ORDERED, this 3rd day of January, 2019.

S/Clay D. Land
CLAY D. LAND
CHIEF U.S. DISTRICT COURT JUDGE
MIDDLE DISTRICT OF GEORGIA